UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**MICHAEL CURTIS**                                                                              **CIVIL ACTION**

**VERSUS**                                                                                            **NO. 16-16292**

**SANDY MCCAIN**                                                                            **SECTION: "H"(3)**


### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Michael Curtis, is a state prisoner incarcerated at the B.B. "Sixty" Rayburn Correctional Center in Angie, Louisiana. On February 16, 2011, he was convicted of manslaughter under Louisiana law.[1] On June 22, 2012, he was found to be a second offender and was sentenced as such to a term of eighty years imprisonment.[2] On March 13, 2013, the Louisiana Fourth Circuit

---

[1] State Rec., Vol. 8 of 10, transcript of February 16, 2011, p. 6; State Rec., Vol. 1 of 10, minute entry dated February 16, 2011; State Rec., Vol. 5 of 10, jury verdict form.
[2] State Rec., Vol. 5 of 10, transcript of June 22, 2012; State Rec., Vol. 1 of 10, minute entry dated June 22, 2012.

Court of Appeal affirmed his conviction and sentence.[3] The Louisiana Supreme Court then denied his related writ application on November 1, 2013.[4]

On October 28, 2014, petitioner filed an application for post-conviction relief with the state district court,[5] and he later supplemented that application.[6] That application was denied on October 7, 2015.[7] His related writ applications were denied by the Louisiana Fourth Circuit Court of Appeal on March 10, 2016,[8] and the Louisiana Supreme Court on May 26, 2017.[9]

In the interim, petitioner filed the instant federal application seeking habeas corpus relief on July 19, 2016.[10] The state filed a response arguing that petitioner's federal application is untimely.[11] The state is correct.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." 28 U.S.C. § 2244(d)(1)(A).[12] On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became

---

[3] State v. Curtis, 112 So.3d 323 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 10.
[4] State v. Curtis, 125 So.3d 420 (La. 2013); State Rec., Vol. 7 of 10.
[5] State Rec., Vol. 2 of 10. In his related writ application filed with the Louisiana Supreme Court, petitioner states that his post-conviction application was filed on October 28, 2014. See State Rec., Vol. 10 of 10, writ application in Louisiana Supreme Court case no. 16 KP 658, p. 2. That is also the date of filing petitioner gives in his federal application. See Rec. Doc. 1, pp. 3 and 14. For the purposes of this decision, the Court will accept those statements as true.
[6] State Rec., Vol. 2 of 10.
[7] State Rec., Vol. 2 of 10, Judgment dated October 7, 2015.
[8] State v. Curtis, No. 2015-K-1334 (La. App. 4th Cir. Mar. 10, 2016); State Rec., Vol. 2 of 10.
[9] State v. Curtis, 221 So.3d 859 (La. 2017); State Rec., Vol. 10 of 10.
[10] Rec. Doc. 1. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner has declared under penalty of perjury that he placed his application in the prison mailing system on July 19, 2016. Rec. Doc. 1, p. 10.
[11] Rec. Doc. 12.
[12] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

> final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003). *However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."* Id. at 694; see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> *Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review. See Foreman, 383 F.3d at 338-39.  As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal. See Causey v. Cain, 450 F.3d 601, 606 (5th Cir. 2006); Roberts, 319 F.3d at 693.  Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal."*

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (emphasis added).

As noted, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence on March 13, 2013.  He then had only thirty days, i.e. until April 12, 2013, to file a writ application with the Louisiana Supreme Court to challenge that judgment.  However, he did not file his related Louisiana Supreme Court writ application until on or after April 16, 2013.[13]  Moreover, although the Louisiana Supreme Court did not assign its reasons for denying the application, the United States Fifth Circuit Court of Appeals has held that the failure to assign reasons cannot be interpreted as an indication that the Louisiana Supreme Court found the

---

[13] State Rec., Vol. 10 of 10, writ application in Louisiana Supreme Court case no. 13 KO 878.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  That date cannot be gleaned from the state court record with respect to this filing.  However, in that petitioner dated his application April 16, 2013, it obviously was not placed in the prison mail system any earlier than that date.

application timely.  Butler, 533 F.3d at 318-19; accord Richardson v. Cain, 628 Fed. App'x 304, 305 (5th Cir. 2016).

Accordingly, the Court finds that petitioner's conviction became final on April 12, 2013, when his deadline for seeking further direct review expired.  His federal limitations period therefore commenced on that date and then expired one year later on April 14, 2014,[14] unless that federal deadline was extended through tolling.

The Court first considers statutory tolling. The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).

During his one-year limitations period, petitioner filed only one application in the Louisiana state courts, i.e. the untimely direct-review Louisiana Supreme Court writ application. However, the United States Fifth Circuit Court of Appeals has expressly and conclusively held that a petitioner is not entitled to *any* tolling credit under § 2244(d)(2) for an untimely direct-review filing. As the Fifth Circuit explained, "[u]nder that provision it is only state *post-conviction relief proceedings* that cause tolling."  Butler, 533 F.3d at 318 (emphasis added).  Because petitioner's untimely writ application was clearly filed as part of the direct-review proceedings, § 2244(d)(2) is simply inapplicable.  See Allen v. Tanner, Civ. Action Nos. 11-927 and 11-1601, 2011 WL 4344586, at *2 (E.D. La. Aug. 19, 2011), adopted, 2011 WL 4345081 (E.D. La. Sept.

---

[14] Because April 12-13, 2014 fell on a weekend, the federal limitations period was extended through the following Monday, April 14, 2014.  See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed.R.Civ.P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

4

15, 2011). In light of that fact, and because petitioner filed no other state applications during the applicable one-year period, he is not entitled to statutory tolling.[15]

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 649 (internal quotation marks omitted); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, the Court also notes that the United States Supreme Court has held: "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013). Petitioner has not invoked McQuiggin. However, in the event he does so in any objections to this Report and Recommendation, the

---

[15] Although petitioner subsequently sought post-conviction relief in the state courts, applications filed after the expiration of the federal statute of limitations have no bearing on § 2244(d)(2) tolling determinations. See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Simply put, once the federal limitations period has expired, "[t]here [i]s nothing to toll." Butler v. Cain, 533 F.3d 314, 318 (5th Cir. 2008).

undersigned finds that petitioner has not made the showing required under McQuiggin for the following reasons.

In McQuiggin, the Supreme Court expressly cautioned: "[T]enable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 133 S. Ct. at 1928 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). Further, as the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted). With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an "independent factual determination" to divine "what likely occurred." Id. (internal quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013); accord Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *2-3 (E.D. La. July 27, 2015), aff'd, 667 Fed. App'x 474 (5th Cir. 2016), cert. denied, 137 S. Ct. 1105 (2017); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence presented at trial and on which petitioner's conviction was based. See, e.g., Johnson, 2015 WL 4528889, at *3; Lyles, 2014 WL 4674673, at *6. Here, that evidence was recounted in the Louisiana Fourth Circuit Court of Appeal's summary of the facts of this case on direct appeal:

> On the evening of March 29, 2009, Officer Thomas Clark of the New Orleans Police Department (NOPD) Sixth District responded to a call pertaining to a shooting incident at 1223 South Johnson Street in the B.W. Cooper Housing

6

Development. He arrived at the scene and observed a black male lying on the steps at that address, bleeding profusely. That individual, Lindsey Singleton, subsequently died.

Detective Nicholas Gernon of the NOPD arrived at the scene at approximately 7 p.m. to assist in the murder investigation. Although he canvassed the area and attempted to speak to potential witnesses, no one gave him their own names or that of any of the perpetrators.

NOPD Crime Lab Technician Shaheed Mohammed photographed the crime scene and collected evidence, including at least two CBC .40 S & W caliber cartridge casings, and wrote a report.

Danielle Singleton, the victim's sister, testified that she was sitting in her parked car with the door open in the driveway of the South Johnson Street residence when her brother was shot. Just before the shooting, he had walked over to her to get a cigarette and returned to the porch where ten or fifteen people were gathered, including Calvin Rankins and their cousin Venezia Singleton. Ms. (Danielle) Singleton was talking on her cell phone when she heard gunshots. After ducking down, she lifted her head and saw a white Grand Prix speed out of the driveway in front of her car. Looking back towards her brother, she saw him run towards her, grab his back, turn around, run to the other side of the driveway, and collapse on a porch. She did not see the license plate or the driver of the car but asserted that a photograph of a white Grand Prix depicted the same model of car, if not the specific car, that she saw drive away after the shooting. She admitted that she and her brother both knew defendant Curtis as a former resident of the housing project but was unable to say whether his (defendant Curtis) relationship with her brother was friendly or one of conflict.

Calvin Rankins testified that he was sitting on the porch with the victim, someone he knew only as "Nunu," (subsequently identified as Venezia Singleton) and other persons when a white Pontiac stopped for a speedbump halfway through the driveway in front of them and "Demond" rolled down the window of the front passenger seat (which was closest to the porch) and pointed a gun. As "Demond" brought up the gun to fire, Mr. Rankins ran.

Mr. Rankins subsequently identified "Demond" in a photographic lineup as [co-]defendant [Demond T.] Solomon. He also identified the driver of the vehicle in another photo lineup shown to him by the police, as well as an individual he referred to as "Bam" in a third photo lineup as the passenger in the backseat of the vehicle. Although Mr. Rankins identified the photo lineups relating to the two defendants, he was unable to definitely identify them in court. Specifically, when first asked whether he saw the shooter and the driver in court, Mr. Rankins replied in the affirmative but then identified defendant (Michael) Curtis as the driver referring to him as "Kevin" and when asked again whether he saw the shooter in court, Mr. Rankins replied in the negative. Mr. Rankins reiterated, however, that the individuals he picked out in the photo lineups were the individuals he saw on the day of the murder. He also asserted that the police did not promise him anything, coerce him in anyway, or force him to make an identification when they

7

showed him the photo lineups.  He stated that he did not know any of the people involved personally and that the only person he had seen prior to the day of the shooting was "Kevin," and that was just around the project.  Mr. Rankins declared he had never seen "Bam" or the individual he referred to as "Demond" before the shooting but that people in the project told him the names of "Bam" and "Demond."  On redirect examination, Mr. Rankins confirmed that the person he identified as "Demond," number five in the photo lineup labeled State Exhibit 41, was the shooter.  When asked if he was certain of his identification, he replied affirmatively.  When asked again on recross examination whether, as he had previously stated, he did not see the shooter in the courtroom, Mr. Rankins replied: "I guess not.  I don't see him.  Not right now I don't.  He could be somewhere else.  I don't know."

In a recorded bench conference after Mr. Rankins was excused as a witness, the State moved to have the court permit the jury to be made aware of the fact that defendant Solomon had obscured his facial tattoos with makeup.  Ultimately, the State read a stipulation to the jury, agreed to by defense counsel, to the effect that defendant Solomon had makeup applied to his forehead for trial that obscured his facial tattoos.  In addition, the defendant removed the makeup at the direction of the court and stood in front of the jury so that the jurors could observe his face without the makeup.

Venezia Singleton, a cousin of the victim, testified that she was sitting to the left of the victim when shots rang out from the white Grand Prix automobile.  Ms. Singleton stated that she saw the window of the vehicle being rolled down and then someone stick a gun out.  The first shot fired hit the ground, but the shooter continued firing.  As she ran behind a car on her left, she felt a bullet graze her.  Her cousin ran in the other direction where there was no cover and, once shot, grabbed his side, staggered across the driveway and collapsed on a porch.  Ms. (Venezia) Singleton remembered seeing Mr. Rankins on the evening of the shooting.  She identified defendant Solomon in court as the shooter and defendant Curtis as the driver of the white Grand Prix.  Ms. Singleton stated that, although she was there when the police arrived she did not speak to them at the scene.  She explained that no one at that time was really talking to the police because the focus was on the victim.

On cross-examination, Ms. (Venezia) Singleton stated that the white Grand Prix slowed down but did not come to a complete stop.  She again confirmed that she never talked to police about the shooting.  She explained that, although the police had tried to contact her through family members, they did not have her real name as at the time of the shooting she went by the nickname "Nunu."  Moreover, she knew that the individuals responsible had been arrested and were incarcerated.  Ms. Singleton stated that she did not decide to testify until the week before the trial.  Upon being called by the District Attorney's Office and informed that the defendants were going to trial, she agreed to come forward as a witness.  Ms. Singleton stated that she learned defendant Solomon's name after the incident from the people who, she surmised, he had been trying to shoot.  Ms. Singleton stated

8

that she had never been shown a photo lineup but that the shooting incident was unforgettable.

On further cross examination, Ms. Singleton stated that she saw two people in the vehicle and that the car windows were tinted, but not darkly. She testified that the windshield was not tinted and that she was able to see both defendants as the car approached the driveway, prior to the passenger side window being rolled down. Although she did not recognize the driver at the time of the shooting, she stated he was sitting in the courtroom. She did not remember what hairstyle the driver had that day – whether he had short hair or long dread locks-and could not see what type of clothing the driver was wearing but he had dark skin and a nose ring.

On redirect examination, Ms. Singleton confirmed that the trial was the first opportunity she had to see the defendants since the shooting. When asked whether there was any doubt in her mind that defendant Solomon was the shooter that day, Venezia replied: "Yeah, that's who it was. It was him." When asked whether there was any doubt in her mind that defendant Curtis was the person driving the car, Venezia replied: "Yes, he was driving."

Dr. Paul McGarry, qualified by joint stipulation as an expert in the field of forensic pathology, performed the March 30, 2009, autopsy on the victim's body, determining that the cause of death was a single gunshot wound to the center of Lindsey's back, two inches to the left of the midline, ten inches below the shoulder. The bullet entered the victim's left lung, causing massive hemorrhage in the left chest cavity, filling his respiratory tract with blood. The bullet then traveled upward into the victim's neck, where the jacket of the bullet was found, and into his mouth, where the lead core of the bullet was found. Dr. McGarry testified to the effect that the wound and the bullet tract were consistent with the shooter being forty-eight to fifty inches off the ground, shooting horizontally from the shoulder, and with the victim bending over in a moving posture, such as a running posture. Dr. McGarry viewed State Exhibit 11, a photo, and confirmed that in the case of someone firing through the window of a sedan, the shooter's shoulder would be about four feet off the ground. Dr. McGarry identified a .40 caliber lead bullet and bullet jacket he recovered during the autopsy of the victim that, he confirmed, caused the victim's death.

It was stipulated by the State and the defense that, if called to testify, Kenneth Leary would qualify as an expert in the field of firearms examination and that he would testify (consistent with his report) that four .40 caliber spent cartridge casings recovered from the scene were all fired from the same gun; that the bullet jacket recovered during the autopsy was consistent with .40 caliber ammunition; and that the lead bullet was unsuitable for caliber identification or comparison purposes.

Homicide Detective Robert Long of the NOPD, the lead detective in the murder investigation, testified that although initial attempts to speak with witnesses at the scene were unsuccessful, when he returned to his office he spoke to Danielle Singleton. He later developed defendants Curtis and Solomon as suspects, along

with Dwayne Butler. Accordingly, he prepared photo lineups for those three suspects, which he identified as State Exhibits 40, 41, and 42, and presented them to Mr. Rankins. Mr. Rankins identified defendant Solomon as the person depicted in photo number five in one lineup, as well as the front seat passenger and shooter. When shown photo lineup labeled State Exhibit 41, Mr. Rankins identified defendant Curtis as the person depicted in photo number three, as well as the driver of the vehicle. Finally, Detective Long testified that in the third lineup Mr. Rankins identified Dwayne Butler, aka "Bam," as the person in photo number two. Detective Long recalled that in his statement Mr. Rankins kept confusing defendant Curtis's first name, referring to him both as "Michael" and "Kevin." He identified State Exhibit 46 as a transcribed copy of a recorded statement by Calvin Rankins, which the defense objected to on hearsay grounds, and confirmed that it reflected Mr. Rankins' confusion as to defendant Curtis' first name.

 Detective Long identified the arrest warrants issued for Curtis, Solomon, and Butler, and testified that, after Officer Dean Moore provided him with defendant Curtis's cell phone number, he obtained a "real time" location of that cell phone – in the 9000 block of Oleander Street. When he arrived in that block, he saw a white Grand Prix parked in front of a residence at 9021 Oleander Street and, upon knocking on the door, defendant Curtis answered it. Defendant Curtis was taken into custody at that point and Detective Long ascertained that the owner of the Grand Prix was defendant Curtis' girlfriend. Detective Long identified a photograph of that vehicle.

 Detective Long confirmed also that, during the course of his investigation, he determined that the cell phone associated with defendant Curtis was used around the time of the murder. Accordingly, he plotted the location of the towers reflected in three calls placed near the time of the murder with a computer-generated printed map of the city. The first call was placed at 5:33 p.m. and received by the cell phone tower near First Street and Simon Bolivar Avenue. The second call, placed 5:48 p.m., was received by a cell phone tower located in the 1200 block of South Derbigny Street which is approximately two blocks from the scene of the murder. The third call was intercepted by a cell phone tower on Erato Street near South Broad Avenue at 5:55 p.m. The detective surmised that the murder occurred somewhere around 5:50 p.m., several minutes before the first 911 call was made. The detective indicated on the city map (State Exhibit 51) where the three cell towers were located and where the murder occurred.

 Detective Long confirmed that a search warrant was obtained for the white Grand Prix but that nothing of evidentiary value was recovered from it. He also confirmed that a search warrant was obtained for the residence of defendant Solomon, but did not recall anything of evidentiary value being recovered from that residence. Detective Long identified both defendants in court. When asked if the defendants looked the way they had at the time he prepared photo lineups for them, the detective replied: "If I remember correctly, no, they do not." On cross examination Detective Long confirmed that the photo in the lineup depicted defendant Curtis with a long dread-lock hairstyle which he no longer had at trial.

Detective Long did not know when defendant Curtis cut his hair, but confirmed that his hair was short at the time of arrest. Detective Long stated that, to the best of his recollection, no one provided him with a physical description of the driver of the white Grand Prix, identified by both Mr. Rankins and Venezia Singleton as defendant Curtis. Officer Moore had discovered the telephone number associated with defendant Curtis and had spoken to defendant Curtis on that number, but when Detective Long checked with the subscriber (Sprint), their records of the number were not in the name of Michael Curtis. Detective Long conceded that he tracked the number to the 9000 block of Oleander Street a month after the murder and there was no evidence Curtis used the cell phone associated with that number on the day of the murder.

Detective Long also conceded that the phone calls associated with the phone on the day of the murder, particularly the one placed at 5:33 p.m., could have been made from three to five miles away from the tower in any direction, i.e., tracking the cell phone towers was not tracking the real time location of the cell phone with a GPS coordinate. Thus, as to the three cell phone calls made around the time of the murder, Detective Long could not say with certainty where the calls were made from, except to within three to five miles of the respective towers.

Detective Long confirmed that no witness identified the license plate number of the white Pontiac found parked outside the Oleander Street residence where defendant Curtis was arrested. He stated that the white Pontiac was photographed and he examined it but, because of the month-long time lapse between the murder and seizure of the vehicle, the vehicle was not processed for evidence and there was no objective evidence linking it to the homicide.

Detective Long acknowledged that despite the number of people in the vicinity at the time of the murder, the only witness he found in the two year period between the homicide and trial was Mr. Rankins. He also acknowledged that he received an anonymous tip that an individual named Kentrell Hickerson was the perpetrator of the crime and, although he compiled a photo lineup containing Hickerson's photo, he did not show it to Mr. Rankins. Detective Long testified before taking the taped statement, Mr. Rankins indicated that he knew all three individuals, defendants Solomon and Curtis, as well as Dwayne Butler but in the recorded statement denied knowing them.

Detective Long said on redirect examination that Crimestoppers had received a tip about Kentrell Hickerson. He further stated that defendants Solomon, Curtis and Dwayne Butler had also been named in Crimestoppers tips. Detective Long identified State Exhibit 46 as a transcript of a recorded statement he took from Calvin Rankins. The State introduced that statement, as well as State Exhibit 66, a CD recording of that statement, over a defense hearsay objection, and the CD was played for the jury.

Officer Moore confirmed that in March/April 2009, defendant Curtis was a person of interest in the homicide investigation and that he assisted Detective Long in locating him. He obtained a contact telephone number from Curtis and gave it to Detective Long and helped Detective Long contact defendant Demond Solomon

11

and Dwayne Butler. Officer Moore confirmed on further cross examination that he found Mr. Rankins and took him to Detective Long and that he did not pay Mr. Rankins for any information in the case.

Frank Mistretta, a private investigator since 1989, with approximately twenty years of law enforcement experience prior to that, testified that he was retained by defense counsel and found that defendant Curtis had been arrested on some traffic attachments on March 3, 2009. He obtained from the Orleans Parish Criminal Sheriff's Office a booking information sheet containing a booking photo of Curtis that was taken on March 3, 2009. Mistretta identified Defense Exhibit 1 as that booking information sheet.[16]

The foregoing "old" evidence was obviously compelling evidence of petitioner's guilt, and so he would face a daunting burden to present a credible "actual innocence" claim. Specifically, the United States Supreme Court has explained: "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- *whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* -- that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995) (emphasis added). Here, petitioner presents no new evidence whatsoever of the type or caliber referenced in Schlup.

For these reasons, petitioner has not met "the threshold requirement" for McQuiggin to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 133 S. Ct. at 1928 (quoting Schlup, 513 U.S. at 329). Accordingly, McQuiggin does not aid him.

---

[16] State v. Curtis, 112 So.3d 323, 326-31 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 10.

Because petitioner is not entitled to statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence" exception applies, his federal application for habeas corpus relief had to be filed no later than April 14, 2014, in order to be timely. His application was not filed until July 19, 2016, and, therefore, it is untimely.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Michael Curtis be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[17]

New Orleans, Louisiana, this twelfth day of October, 2017.

*Daniel E. Knowles, III*

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[17] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.